UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOMMY EUGENE THOMAS, | No. C 12-6012 SI (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| CALIFORNIA ATTORNEY GENERAL, | |
| Respondent. | |

## INTRODUCTION

Tommy Eugene Thomas filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Following a jury trial in Monterey County Superior Court, Thomas was found guilty of assault with a deadly weapon[1] and unlawful possession of ammunition by a felon. The jury found him not guilty of attempted murder and not guilty of attempted voluntary manslaughter. On January 30, 2009, the trial court suspended imposition of sentence and granted Thomas a term of three years of probation, although a condition of probation was that Thomas had to serve 240 days in county jail.

The California Court of Appeal described the evidence relating to the crime at length, and then engaged in an unusually detailed harmless error analysis of the self-defense theory which

---

[1] The weapon was a barbecue fork about 13-14 inches long. *See* RT 289.

it considered to be a "patchwork of highly improbable inferences" and a "tortured labyrinth of unlikelihoods proffered by the defense." Resp. Ex. C, California Court of Appeal Opinion ("Cal. Ct. App. Opinion") at 23.

**Prosecution Account**

Defendant sometimes held parties in a converted garage at his Seaside home known as the "boom-boom room." On February 4, 2007, he hosted a party there to watch the Super Bowl football game. Guests included his girlfriend Sheila Castillo and two male friends, Curtis Thomas and Tony Goodrich. Defendant's then-best friend, Sidney Thissel, arrived around the time the game started, which was late afternoon. Also present, at least when the events at issue here took place, was Sidney's brother Kevin. Alcohol and marijuana were consumed. Later that evening defendant's blood alcohol content was tested at .147. Kevin's blood alcohol content was .146.

After the football game some of the male partygoers, including defendant, Sidney, and Kevin, began playing dominoes. Each game required a $5 contribution to a pot which was apparently taken by the first player to accumulate a prescribed number of points by scoring in individual "hands." FN1

> FN1. According to defendant, the last game required a $10 contribution. Sidney denied that the stake ever went up from $5.

Sidney testified that after several games were played without incident, Tony Goodrich "played bogus": he "knocked," meaning he said he was unable to play a tile, when in fact he could have played a tile. This required him to leave the game. Shortly thereafter, apparently, Sidney also played bogus. He too would have been required to leave the game, at least on timely objection by a player, but he apparently resisted doing so on the ground that his illegal play was only noticed by Curtis Thomas (no relation to defendant), who was only keeping score, not actually playing. Further, according to Kevin and Sidney, the bogus play was only called after the hand was over, which was apparently, in some opinions, too late. In any event Sidney began arguing with defendant, who believed he was on the verge of winning the game.

According to Kevin and Sidney, Kevin decided at this point to take his money out of the pot and leave the party. He announced this intention. Defendant objected. Kevin took some money, as well as his cell phone and keys, off the table. Defendant punched him in the mouth, and Kevin punched defendant in the eye. The two men "locked up and went to the floor," where they started "wrestling." After maybe half a minute, others pulled them apart. Either while they were wrestling, or while they were being separated, defendant bit Kevin on the chest.

Kevin threw the money he had taken onto the floor. Defendant was bleeding from a cut above his eye. He was escorted to the door and ran into the main house. Sidney and Curtis told Kevin to leave. Testifying over a relevance objection, Sidney said that he was fearful for Kevin's safety because he knew that defendant "ha[d] guns in the house," and had seen them there. Kevin himself testified that he was "sure [defendant] had a gun." Asked if defendant had "display[ed] a gun ... that night," Kevin replied, "Not that night."

Kevin left the party and walked toward his car. Defendant came out of the house and ran after him. Kevin had reached his car, and was trying to put his keys in the door, when he saw "somebody running toward me fast," whereupon he turned and saw it was defendant. Defendant did not say anything, and Kevin could not tell if he had anything in his hands.

2

Kevin "t[ook] off running" and they "ran a little bit," but as defendant caught up with Kevin, Kevin asked "what did he have? I mean, are you going to shoot me, or what?" FN2 Defendant stabbed him in the side with a barbecue fork he had been using to cook that day. According to Kevin, defendant tried to stab him a second time, but he managed to fend him off until Sidney and others reached them. When they did, defendant ran back to the house.

> FN2. Kevin gave two other versions of this utterance: "[W]hat are you going to do, shoot me?" and "You going to shoot me, man?"

Sidney testified that when defendant came out of the house and ran after Kevin, Sidney and Curtis Thomas followed. Defendant "r[a]n up on" Kevin as the latter was trying to get into his car. Defendant was "screaming." Kevin turned to face him and threw his hand up in a way that looked to Sidney like there was going to be a fistfight. Defendant made a motion with his hand that looked "like he was throwing a punch or something." By the time Sidney reached them he knew defendant was swinging something in his hand, though he could not see exactly what it was. After Sidney and Curtis separated them, Kevin said defendant had gotten him "bad." Kevin fell to the ground. Defendant "took off running back to the house."

**Defendant's Account**
Defendant testified that he supplemented his income by selling his Louisiana cooking both for take-away and to guests at his parties. On this occasion, Sidney had said that he wasn't going to eat anything because he intended to eat at another party. On that basis he had contributed nothing for food. But throughout the day he kept "sampling" food, using a barbecue fork and tongs to take it. This "bothered" defendant. Eventually, after the men had begun playing dominos, defendant decided to put a stop to Sidney's depredations by delivering most of the remaining food to his neighbor. While placing it in a container he wiped off the foot-long barbecue fork Sidney had been using to serve himself and "tuck[ed] it down my belt." When one of the domino players called a cigarette break, defendant tried to deliver the food to the neighbor. No one was home, so he set the food on his own refrigerator. He "tuck[ed]" the barbecue fork "down in my belt," he testified, so that he could use it to clean up after the domino game. According to him, that is where it remained until he used it to stab Kevin.

The defense contended that Kevin's blows in the boom-boom room inflicted a concussion, which impaired defendant's judgment and memory and affected his mental state. Consistent with this theory, defendant's account of the evening's violence was somewhat hazy on many points. He remembered "get[ting] into an altercation with Sidney." He remembered Kevin standing up, grabbing money off the table, and "going through it," perhaps counting it. He remembered reaching to grab it. He remembered being struck, but did not know "which one of them hit me." He remembered "biting him," and then standing up after "they pulled him off of me." He felt that he "must have lost consciousness" at some point because "I don't know how I got on the floor."

Defendant testified that after being separated from Kevin, he went into the house to see "how serious" the injury to his eye was. He did not remember seeing any money on the floor or the table in the boom-boom room. Now, after examining his injury, he left the house to find Kevin in order, apparently, to get back the money out of which he felt he had been cheated. At any rate, as he caught up with Kevin, the latter said, " 'What you going to do, shoot your brother?' " Defendant "said I just want my money back." Kevin fumbled with his pocket, and defendant thought he saw "a clip with a knife, a razor knife," that he knew Kevin sometimes carried. He had seen Kevin use the knife to cut sheet rock. Kevin "never actually got it out," but defendant thought he was about to do

3

so. Thinking "to defend [him]self," defendant "recalled having a fork" and "just reacted." "[T]he fork was just there, and I just took it and I stabbed him." Afterwards, when everyone went to Kevin's aid—including defendant's girlfriend Sheila—defendant thought "everybody was on [Kevin's] side, and I just snapped the fork," apparently meaning he broke it in two. He took it into the house and placed it on the freezer, where officers found it.

**Search of House**
Police officers arrived and searched the area for the weapon used in the stabbing. Finding none, they obtained a search warrant and searched defendant's house. They entered through the kitchen, where they found the barbecue fork, with blood still on it, sitting on a waist-high freezer. They nonetheless performed a "protective sweep," which means to enter every room in the house in order to "make sure there's no other people inside the house, for safety." One of the rooms—defendant's bedroom, judging from the presence of his driver's license, a business card, and men's clothing—looked like "it had been gone through, somebody had been in there just prior to us getting there." Lying near the door was an empty handgun holster. A second holster lay next to the bed. Underneath the bed an officer found a "plastic-type storage container" holding a seven-shot handgun magazine (clip) with five live bullets in it, plus ammunition boxes containing handgun cartridges.

**Character Evidence**
In support of the contention that defendant had suffered a concussion, defense counsel elicited testimony from Sidney that the events of the evening were so unexpected as to shock those present. Some, including Sidney, were crying. Sidney had known defendant to verbally threaten people, but had never seen him exhibit violent activity "like that" toward himself or Kevin. He had never seen defendant react like that even in arguments with complete strangers. He thought defendant might have been on drugs or something—that something was wrong with him. He agreed that defendant's conduct was "out of character." On redirect questioning by the prosecutor, however, Sidney acknowledged that he had seen defendant "get violent" with others "[a] few times, probably three or four." Defendant, he said, has "got attitude." Sidney had seen defendant get in a fight before, which he won. Defendant and Kevin had "played around" before, wrestling, too. Defendant usually got the better of those matches because he "knows how to wrestle better ." As between himself and Kevin, defendant seemed the more dominant. But Sidney agreed with the prosecutor that, on this occasion, Kevin "got the best of Tommy Thomas," and "[e]verybody knew it." Defendant seemed embarrassed, angry, like he wanted to get even.

In connection with the ammunition charge and as a result of defendant's testifying, the jury also learned that defendant had suffered unspecified felony convictions in 1993 and 1994.

**Proceedings**

\* \* \*

At trial, no real defense was offered to the ammunition charge. As to attempted murder and assault, the chief defense theory was self-defense, i.e., that defendant stabbed Kevin in the reasonable belief that Kevin was pulling a knife from his pocket with which to attack defendant. The jury was instructed on two additional defenses bearing only on the attempted murder charge: (1) imperfect self-defense, i.e., defendant stabbed Kevin in the mistaken but unreasonable belief that he needed to use force to defend himself, and therefore lacked the malice necessary for murder; and (2) heat of passion, i.e., defendant

4

> acted in the heat of passion, as the result of provocation, and therefore, again, lacked malice.
>
> The jury acquitted defendant entirely on count 1 [attempted murder]. On count 2, the jury found him guilty of assault with a deadly weapon, but found that he did not inflict great bodily injury. The jury also found him guilty of possessing ammunition as alleged in count 3.
>
> Defendant moved to reduce the remaining charges to misdemeanors pursuant to section 17, subdivision (b)(1). The court granted the motion as to the assault charge, denied it as to the ammunition charge, suspended the imposition of sentence, and placed defendant on probation with conditions including 240 days in jail. This timely appeal followed.

Cal. Ct. App. Opinion at 2-8.

Thomas has urged in his federal petition for writ of habeas corpus that he received ineffective assistance of counsel in that trial counsel (a) failed to present evidence that two people saw the victim with a knife several months earlier, (b) failed to prevent the prosecution from introducing evidence that Thomas had not asserted a self-defense claim immediately following the assault, and (c) failed to challenge the validity of the search of his house. Respondent has filed an answer and Thomas has filed a traverse.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Monterey County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784-85 (2011) (one-sentence order denying habeas petition analyzed

under §2254(d)). Neither party disputes that the state appellate court's one-sentence denial of the habeas petition amounted to a rejection of Thomas' claims on the merits.

## DISCUSSION

The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* To prevail on an ineffective assistance claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, *id.* at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, *see id.* at 691-94.

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11 (2011). The "question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788. As the claim was rejected by the California Court of Appeal without explanation, this court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 786.

A.   <u>Failure to Present Additional Evidence That Victim Had Knife In The Past</u>

Although the defense presented some evidence at trial that the stabbing victim had carried a knife in his pocket in the past, Thomas now faults defense counsel for not presenting additional

evidence on the point. The evidence that *was presented* was Thomas' testimony that he was aware that Kevin Thissel usually carried a knife. *See* RT 285-86, 293, 297, 302-03. Thomas also testified that he had seen Kevin Thissel, who was in the construction trade, use the knife as part of his work to cut sheetrock. RT 304-05. The other item of evidence presented was a stipulation that, if called as a witness, Calvin Mitchell "would testify that he had seen Kevin Thissel with a box cutter blade approximately six months before this incident." RT 305. In his habeas petition, Thomas urges that defense counsel should also have (a) presented evidence that, when Calvin Mitchell saw Kevin Thissel with the knife/box cutter, it was *at Thomas' house* and (b) called Thomas' girlfriend, Sheila Castillo, to testify that she had seen Kevin Thissel "with a folding pocket knife with a blade approximately four-inches long at Mr. Thomas's house during the summer of 2006." *See* Traverse, Ex. C.

Trial counsel prepared a declaration for the state habeas proceeding regarding the claim. Counsel stated that he did not call Sheila Castillo to testify because "she seemed almost too eager to testify" and he did not think she would be credible. Counsel also thought that Kevin Thissel's demeanor and testimony showed him to have committed violent acts in the past. *See* Traverse, Ex. A.

The California Court of Appeal's rejection of this ineffective assistance claim was not contrary to or an unreasonable application of *Strickland*. That court reasonably could have determined that there was no deficient performance in not presenting the evidence, which was both stale and weak because the two witnesses had seen Kevin Thissel with a knife at least six months before the stabbing, but neither witness knew whether Kevin Thissel carried the knife on an ongoing basis or on the day Thomas stabbed him. Also, counsel had made a tactical decision not to call Sheila Castillo as a witness because he perceived that she lacked credibility. Counsel may have chosen not to pursue the evidence from Calvin Mitchell because the stipulation was more favorable than his testimony might have been with respect to its staleness (i.e., the stipulation was that he had seen the knife six months earlier yet the investigator's notes indicated it was six to twelve months earlier) even though it would have added the detail that it

was at Thomas' house that Mitchell saw Kevin Thissel with the knife. *See Brodit v. Cambra*, 350 F.3d 985, 994 (9th Cir. 2003) (state court reasonably concluded that trial attorney provided effective assistance of counsel where attorney declined to present evidence favorable to defense out of concern that it would open door to unfavorable evidence).

It also would have been reasonable for the California Court of Appeal to conclude that Thomas' claim failed on the prejudice prong of *Strickland*. The additional evidence was of limited value due its staleness and mostly cumulative nature. The fact that Kevin Thissel was seen with a knife *at Thomas' house* made little difference, as that sighting was many months earlier and did not involve him brandishing the weapon. Also, Thomas did not testify that he actually saw a knife in Kevin Thissel's hand or pocket before he stabbed him with the fork. The omitted evidence was only marginally relevant to whether Thomas had reason to believe that Kevin Thissel was carrying a knife when Thomas stabbed him.

The California Court of Appeal's harmless error analysis for Thomas' other claims applies equally to the ineffective assistance of counsel claims.[2] As the state appellate court concluded, the prosecution's case was "supported by, or at least easily reconciled with, all of the evidence except defendant's own testimony, and it could be fairly readily reconciled even with much of his testimony." Cal. Ct. App. Opinion at 13. The court observed that Thomas' self-defense theory "could avoid logical incoherence only with the aid of a number of dubious inferences and highly indulgent suppositions." *Id.* at 14. The state appellate court explained in detail that the fact that Thomas had chased after Kevin Thissel before stabbing him was devastating to the self-defense theory. *See id.* at 14-16. The court also examined the testimony closely to conclude that Thomas' version of the events after he caught up with Kevin Thissel was implausible.

---

[2]This is not to say that the harmless error analysis and *Strickland* prejudice prongs are interchangeable, or to say that the harmlessness/prejudice analysis for one kind of claim can be indiscriminately borrowed for another kind of claim. Rather, the propriety of borrowing the analysis depends on the substance and reasoning of the harmless error analysis. Here, the California Court of Appeal's extensive analysis of the weaknesses in Thomas' self-defense theory can be considered to determine whether there was a reasonable probability that the result of the proceedings would have been different had counsel done the three things Thomas claims he should have done.

9

Among other things, Kevin Thissel expressed fear that Thomas was going to shoot him, and that would have made it highly unlikely that he would have drawn a knife if he feared Thomas would have drawn a gun. The state appellate court also saw the record lacking in "any conduct by Kevin that could give rise to a belief, reasonable or otherwise, that he was about to attack" Thomas: Thomas did not see a knife and instead only saw Kevin Thissel fumbling with his pocket (after Thomas demanded money) before preemptively stabbing him. *Id.* at 16-17. The California Court of Appeal considered the testimony that Thomas just happened to have a barbecue fork on his person "perhaps the greatest of all the implausible turns in the defense narrative," *id.* at 20, as it would have required the jury to accept that Thomas had picked up only the fork (but not the tongs) with which a guest had been pilfering food, had not left the fork in the kitchen when he went there, had sat down to play dominoes with the barbecue fork shoved in his belt without injuring himself, and had fought and wrestled with Kevin Thissel in the garage without anyone being injured by the fork – all before fortuitously having it available when he caught up with Kevin Thissel at the latter's car as he tried to leave the party. The California Court of Appeal reasonably could have concluded that, given the extreme weakness of the self-defense evidence plus the marginal value of the evidence regarding Kevin Thissel carrying a knife in the past, there was no reasonable probability that the result of the proceedings would have been different if the defense had introduced the additional knife evidence.

B.     Failure to Prevent Introduction of Evidence That
       Thomas Did Not Immediately Claim Self-Defense

Thomas urges that trial counsel should have done something in response to the prosecutor's argument that Thomas' silence and failure to mention self-defense at the time of his arrest was evidence of his guilt. He claims that counsel should have objected to the evidence under California Evidence Code section 352 because, in Thomas' view, his silence was not inconsistent with his claim of self-defense. *See* Docket # 1 at 6. In his traverse, he argues that counsel should have presented evidence that, in a recorded telephone call from jail a day or two after the arrest, Thomas had mentioned self-defense to his girlfriend, Sheila Castillo.

Trial counsel provided a declaration for the state habeas proceeding in which he stated that he had a strategic reason for not objecting to the prosecutor's reference to Thomas' post-arrest silence: "I did not want to emphasize it to the jury. My goal was to persuade the jury that Mr. Thomas could not have been expected to make a complete and accurate statement at that time because he was suffering the effects of a concussion. I do not recall whether I was aware there might have been a foundational objection to the prosecutor's line of argument." Traverse, Ex. A. As to the jail telephone call recording, trial counsel declared that he did not bother to get the jail telephone call recordings between Thomas and Castillo because doing so might prompt the prosecutor to listen on other calls and those might have had incriminating evidence.

The California Court of Appeal reasonably could have determined that there was no deficient performance in light of the evidence of trial counsel's stated strategic reason. Thomas does not show why it would have been unreasonable for counsel to avoid further emphasis on Thomas' failure to claim self-defense when his defense theory was that Thomas had suffered a concussion that muddled his thinking.

The California Court of Appeal opinion indirectly addressed the jail telephone call recording in a footnote to its discussion about the meritlessness of the self-defense argument. The court explained that such a recording "would only establish that defendant mentioned the self-defense claim well after the fact–long enough to calm down and consider the seriousness of his situation. It was his failure to refer to self-defense *at the scene* that the prosecutor justly identified as incriminating." Cal. Ct. App. Opinion at 23 n.15. Further reducing the value of the evidence was the fact that Thomas was aware that jail telephone calls were recorded. *See* RT 294. Thus, the California Court of Appeal reasonably could have found no deficient performance or prejudice on the failure to introduce the recorded telephone call.

The California Court of Appeal also reasonably could have used the same reasoning discussed in Section A, above, to determine that there was not a reasonable likelihood that the result of the proceedings would have been different had counsel objected to the evidence and argument that Thomas had not asserted a self-defense claim when arrested and had counsel

11

presented the jail telephone call recording.

C.   <u>Failure To Challenge The Validity Of The Search Of The House</u>

Thomas urges that counsel was ineffective in failing to move to suppress evidence obtained during a search that he contends was conducted before the search warrant was signed by a judicial officer. Thomas points out that the search warrant was signed at 12:25 a.m. on February 5, 2007, yet officer Borges said in the sworn search warrant return that he conducted the search on February 4, 2007, and Sheila Castillo (Thomas' girlfriend) would have corroborated that the search occurred at 11:30-11:45 p.m. on February 4, 2007. Thomas contends that, had the search been challenged, the jury would not have learned that he had ammunition and gun holsters in his home.

To prevail on the claim that trial counsel failed to litigate a Fourth Amendment claim competently, a petitioner must demonstrate "that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

The California Court of Appeal's rejection of this ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court. The California Court of Appeal reasonably could have determined that counsel did not engage in deficient performance in not moving to suppress the evidence obtained during the search. There was a conflict in officer Borges' statements, but it was a conflict that easily could have been explained, i.e., he could have been mistaken as to the date due to the fact that the events occurred in the two-hour window surrounding midnight when the date changed from February 4 to February 5. Although officer Borges stated in the sworn search warrant return dated March 1, 2007 – more than three weeks after the search -- that he had searched the house on February 4, 2007, he also stated that he had received the attached warrant issued by the judge on February 4, 2007. *See* Docket # 1 at 10. At least the latter

statement was plainly wrong, as the warrant was issued at 12:25 a.m. on February 5, 2007, although it had been applied for sometime after 10:00 p.m. on February 4, 2007. Also, there is no strong evidence that Borges searched the house before the warrant was signed by the judge. Officer Borges testified that he "believe[d] at about 11:45 is when [the judge] reviewed and signed [his] search warrant," RT 216, and that he and other officers "executed the search warrant at about 30 minutes past midnight," RT 218. Thomas now presents evidence that, when interviewed twenty months after the fact, Sheila Castillo thought the search occurred between 11:30-11:45 p.m., without any explanation of how she had made note of the time. *See* Docket # 14 at 11. Counsel already had doubts about Sheila Castillo's credibility and may have had further doubts about her estimating abilities twenty months after the incident. Further, a distracting collateral issue may have arisen about Castillo's credibility on the search of the house: police officers stated they saw her in Thomas' house, whereas she denied having entered the house. *Compare* RT 62 *with* Docket # 14 at 11. Finally, even if the ammunition and holsters had been suppressed, there was other evidence that Thomas had guns: Sidney Thissel testified that Thomas had guns in the house, and Kevin Thissel thought Thomas had a gun, although he did not see it that night.

Although the California Court of Appeal's opinion did not discuss the ineffective assistance claim, that court's analysis of a different claim regarding a severance motion also demonstrates that the court reasonably could have concluded that there was no reasonable probability that the result of the proceedings would have been different had counsel moved to suppress the evidence obtained during the search of the house, assuming counsel would have been successful on such a motion. The state appellate court observed that the evidence obtained during the search actually may have helped Thomas on the attempted murder and attempted voluntary manslaughter charges he also faced. The "most likely explanation for [the acquittals on attempted murder and attempted voluntary manslaughter] is that the jury was unable or unwilling to find that defendant acted with the requisite *intent to kill* when he stabbed Kevin with the barbecue fork. One fact clearly casting that element in doubt was defendant's apparent

13

access to guns. Given the evidence that guns had been in the house very recently – in all likelihood, at the time of the stabbing – defendant would presumably have used something more suitable than a barbecue fork if he had intended to kill Kevin." Cal. Ct. App. Opinion at 9-10 (footnote omitted). The California Court of Appeal also flatly rejected any notion that "a jury not exposed to evidence of holsters and ammunition would have entertained a reasonable doubt as to whether defendant acted in self-defense." Cal. Ct. App. Opinion at 11. Even if the evidence was excluded, the jury would have heard testimony from Sidney Thissel that Thomas had guns in the house, and from Kevin Thissel that he was sure that Thomas had a gun. *See id.* And even without the gun evidence, the self-defense theory was "extremely weak in its own right," as it required the jury to reject the prosecution's theory that Thomas had attacked Kevin Thissel "in a rage flowing from the injury and humiliation" he had suffered in their earlier fist fight and required the jury to accept the self-defense theory that "could avoid logical incoherence only with the aid of a number of dubious inferences and highly indulgent suppositions." *Id.* at 13, 14. The weakest links in the self-defense theory were the lack of logical and credible explanations for why he chased after Kevin Thissel, why he "suddenly formed the reasonable belief that Kevin was about to attack him, so as to justify what was in effect a preemptive strike," and how he happened to have the barbecue fork with him when he caught up to Kevin Thissel. *Id.* at 14-20.

Finally, although Thomas thinks counsel did an inadequate job, Thomas fails to note that he (Thomas) fared *very well* in light of the circumstances. In a case in which he chased after the victim and admittedly stabbed the victim with the barbecue fork, and in which he was charged with attempted murder, he ended up with only a misdemeanor assault conviction. Counsel's hand in obtaining that result for him should not be ignored.

Giving the state court's decision the deference to which it is entitled under § 2254(d)(1), this court cannot say the rejection of the three ineffective assistance of counsel claims was contrary to or an unreasonable application of clearly established federal law as set forth by the Supreme Court.

C.     No Certificate Of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## CONCLUSION

The petition for writ of habeas corpus is denied on the merits.

The clerk will close the file.

IT IS SO ORDERED.

DATED: October 21, 2014

_____
SUSAN ILLSTON
United States District Judge

15